of the relator as an inspector was limited to a particular purpose, and in connection with a special work; and even there the court expressly said that if he had been a general employé as inspector, he would have come within the preference of the act of 1887. The statutory preference to which veterans are entitled would amount to very little, so far as laborers are concerned, if veterans could lawfully be discharged from the public employment at the approach of winter, while men who are not veterans could be retained in the service of the municipality, doing substantially the same work. It is quite true, as stated in the opinion at special term, that the duty of the commissioner of city works was to discharge all men whose services were no longer needed; but this duty must be exercised with reference to the command of the statute in regard to the preference to which veterans are entitled, and, wherever there are two men employed in a public department, one being a veteran and the other not, and the services of only one man are required for the future, the statute makes it the duty of the superior officer who has the power of discharge or dismissal to retain the veteran, rather than the man who has never been in the military or naval service of the nation. This case turns upon the question whether Gavin was, in fact, retained to perform the same sort of service which McCloskey also had been rendering; and an alternative mandamus should be awarded in order that this question may be tried and determined.

The order appealed from must be reversed, and the application granted so far as to award an alternative writ; costs to abide the event. All concur.

---

(16 App. Div. 24.)

McCORMACK v. NASSAU ELECTRIC R. CO.

(Supreme Court, Appellate Division, Second Department. April 13, 1897.)

IMPUTABLE NEGLIGENCE—PERSONS ENGAGED IN JOINT VENTURE.

An instruction that the negligence of one person will be imputed to another, on the theory that they were engaged in a joint venture, is properly refused where the evidence is not such as to require a finding that there was a joint venture, and that question was not submitted to the jury.

Appeal from trial term, Kings county.

Action by Ann McCormack, as administratrix of John McCormack, deceased, against the Nassau Electric Railroad Company, to recover damages for the death of plaintiff's intestate, alleged to have been caused by defendant's negligence. From a judgment entered on a verdict in favor of plaintiff for $12,000, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, HATCH, and BRADLEY, JJ.

James C. Church, for appellant.
Morris & Whitehouse, for respondent.

HATCH, J.  The evidence tended to establish that, when the driver of the ice wagon started his team to cross the street and tracks of the railroad, defendant's car, which inflicted the injury, was upon the north side of the street, and distant from the point where the team started to cross about 133 feet.  The car at this time was stationary, or just upon the point of starting.  There was nothing between the ice wagon and the car to obstruct the vision of the motorman, and the relative situations of wagon and car were plainly visible.  The movement of the ice wagon was such that if the motorman had observed it,—and there was no reason shown why he should not,—he would have been apprised that the intention of the driver was to turn the wagon in the street.  That the wagon was a cumbersome affair, and needed considerable space to turn around in, was also apparent.  At the time when the car started, it was clearly under the control of the motorman, and there existed no reason why he should not have continued to so operate it as to be able to stop, practically upon the instant, in view of the apparent obstruction in the street created by the wagon.  In fact, the car was so operated as to come in contact with the rear end of the wagon, inflicting the injury resulting in the subsequent death of plaintiff's intestate, and from such fact and the circumstances the jury was authorized to find defendant guilty of negligence.

It also appeared from the testimony of the driver that, when he got upon the wagon, he looked, and saw the car standing on the north side of Twenty-Fifth street, and he then started to swing around over the street.  The jury were authorized to find from the existing circumstances that the driver of the wagon was justified · in concluding that it was safe for him to attempt to turn the wagon in the street, and to exonerate him from any negligence in connection with such act.

The deceased jumped upon the rear step of the wagon, that being his accustomed place when the wagon was in motion.  What his opportunities for observation were from this position is not clear from the testimony.  But if his opportunity for observation was equal with that of the driver, or better, there was nothing in the then condition of the car that would create an apprehension in his mind that it was unsafe for him to get upon the wagon.  At least, the jury was so authorized to find.  Nor do we find in the record controlling evidence which would justify the court in determining, as matter of law, that anything which the deceased thereafter did or omitted to do constituted contributory negligence upon his part.  The jury were therefore authorized to find that the deceased was free of negligence contributing to the injury.  These questions are not left to mere inference, although that would be sufficient if it was legitimately derived from the facts proved.  But in this case the relative positions of the car and wagon were given; the movements of each from the time each started was described; the position of the persons upon the wagon and their opportunity for observation appeared, as well as the position of the motorman in charge of the car, and the movement of the car

itself. The jury therefore had the facts before them, and they were authorized to determine from those facts these questions, even though there was no affirmative proof as to just what the deceased did after taking his place upon the wagon.

It is insisted, however, that the court erred in refusing to charge the jury, upon request of the defendant, that "if they find that the accident was occasioned in part by the negligence of the defendant, and in part by the negligence of Simms, the driver of the ice wagon, that then the plaintiff cannot recover." An exception was taken to the refusal. The argument upon this branch of the case is based upon the claim that Simms, the driver of the wagon, and the deceased, were engaged in a joint venture, and that, therefore, the negligence of the former was imputable to the latter. There was a view of the evidence upon which the jury might have found that the driver was guilty of negligence, in consequence of which the defendant had the right to have considered the legal effect of such negligence, if the jury so found, and to have them properly instructed upon the subject of that relation. And the fact that the jury could or may have exonerated the driver of negligence does not change the right of the defendant to have the charge made, if legally entitled thereto, for the jury may have found the driver in fact guilty of negligence, and exonerated the deceased, upon the ground that it was not imputable to him. While this is true, we think no legal error was committed in refusing the charge. The ice wagon was the property of the Knickerbocker Ice Company, and the driver of the wagon and the deceased were in the employ of that company, engaged in the delivery of ice -to its customers. Simms had charge of the wagon, and the deceased was his helper, having no other duties to perform than the service of ice to customers, and having no will in or control over the management of the team and wagon. This is not contended against. But claim is made that, in connection with this business, these two men were engaged in a joint venture of their own in the ice business. The testimony upon that subject is quite meager, and leaves the matter in much doubt. Simms states that the deceased "got seven and a half off the company, and then, on a Saturday night, I would throw him $5, or may be $4. Q. You bought ice from the company, which you disposed of, and paid them so much? A. Yes, sir; he helped me with that, and for that I paid him extra. * * * Q. You say you used to toss him three or four or five dollars on a Saturday night. I suppose you mean by that that, if you had a good week's business, you would give him five dollars, and, if you didn't have quite as good, you would give him three; was that it? A. Well, that is about it. Q. That is, if the business that you had during the week was good, of course there was more for you to divide, and, if it was poor, why, there was less for you to divide? A. Yes." This testimony is far from establishing to a certainty that there was a joint venture. Simms says he bought the ice, and the deceased helped him, for which he paid the deceased extra. If he did well, there was more to divide; if not, less. If the use of the word "divide" conveys the idea that both were jointly interested, there

might be some claim of a joint venture. But it is entirely consistent with the idea of payment for service; as first stated. We may have our suspicions how this part of the business arose, and. in what this venture consisted, in view of the fact that the employment of the men was to deliver ice to the customers of the ice-company, for which they were paid wages. But we are now considering the effect of this testimony, and can well see that the jury might have found that this business was the sole business of Simms, in which the deceased had no interest, and that there existed neither the relation of principal and agent or joint interest between the parties. This question became therefore one of fact,. and, in order to raise the question which is now sought to be presented, the court should have been requested to submit it to the jury, and then, if the jury found that there was a joint venture,. the request which was made and refused would have become proper. No such request, however, was made, and the question now sought to be presented by counsel is not before us, and no error is found is the refusal of the court to charge as requested.

We do, however, reach the conclusion that the verdict in this case is excessive. The reason why we reach this conclusion is that the pecuniary loss to the next of kin does not in any fair view reach the amount of the verdict. It scarcely aids to the settlement of any fixed rule to set out our reasons in detail upon this question, as each case must stand upon its particular facts.

The judgment in this case should be reversed, and a new trial granted, with costs to abide the event, unless plaintiff stipulates within 20 days to reduce the recovery to the sum of $8,000 and proportionately the interest thereon and the extra allowance; and, if plaintiff so stipulates, the judgment as modified is affirmed, without costs to either party. All concur.